UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TYRONE EUNICE BEY, | : | |
| Plaintiff, | : | Civil Action No. 11-7343 (RBK) |
| v. | : | |
| HILLSIDE TWP. MUNICIPAL COURT, | : | |
| Defendant. | : | |
| TYRONE EUNICE BEY, | : | |
| Plaintiff, | : | Civil Action No. 11-7351 (RBK) |
| v. | : | **MEMORANDUM   OPINION** |
| NEW JERSEY STATE POLICE at el., | : | **AND ORDER** |
| Defendants. | : | **Applies to Both Actions** |

The above-captioned matters come before the Court upon two sets of submissions made by plaintiff designated as "Tyrone Eunice Bey"[1] ("Plaintiff"), and it appearing that:

---

[1] Plaintiff seemingly maintains a Facebook page, where he designates himself/herself as "Tyrone Eunice-Bey," see <<http://www.facebook.com/people/Tyrone-Eunice-Bey/100000567884917>>, and it is no doubt that Plaintiff's name used by the state courts is "Tyrone L. Burton," see Bey v. NJ State Police, Civil Action No. 11-7351 (RBK) (N.J.D.), Docket Entry No. 1, at 8-9, while "Tyrone Eunice-Bey" is merely one of his aliases. (A person known as "Tyrone Burton," born in the same month and year as Plaintiff, served a New Jersey state prison term from October 25, 1999, to February 20, 2001. See <<https://www6.state.nj.us/DOC_Inmate/details?x=1177345&n=0>>. At this juncture, the Court can neither establish, with a sufficient degree of certainty, nor rule out the possibility that such inmate and Plaintiff is the same person, or that Plaintiff's current alias is a product of his prior incarceration, and that the "official misconduct" violation underlying such inmate's incarceration had affected the factual predicate asserted by Plaintiff in the two matters at bar.  Plaintiff's submissions indicates that Plaintiff was incarcerated, seemingly, for the second time in 2011, see Civil Action No. 11-7351 (RBK), Docket Entry No. 1, at 3 (asserting that Plaintiff was incarcerated at the Essex County

1.  In Bey v. Hillside Twp. Municipal Court (Burton-I), Civil Action No. 11-7343 (RBK) (N.J.D.), Plaintiff submitted a civil complaint, see id., Docket Entry No. 1, an application to proceed in that matter in forma pauperis ("IFP"), see id, Docket Entry No. 1-1, and two exhibits, see id., Docket Entries Nos. 1-3 and 1-4.  Specifically:

    a.  Plaintiff's IFP application indicates that Plaintiff has no source of income of any kind, no private possessions and, oddly enough, even no expenses of any kind.[2]

        See id., Docket Entry No. 1-1.

    b.  Plaintiff's civil complaint is executed not on the pre-printed form distributed by this District; rather, it a compilation of: (a) the first page of a document generated on the basis of an on-line template disseminated by one of "Moorish" websites, as detailed infra, see Docket Entry No. 1, at 1; (b) the last page of the same, see id. at

---

Jail and at the Burlington County Jail in January 2011).  That incarceration appears related to Plaintiff's claims at bar, since Plaintiff was confined in connection with the charges underlying the penalty Plaintiff seems to be disputing now.)  Moreover, while Plaintiff designated "723 West Grand Avenue, Rahway, New Jersey 07065," as his current address, Plaintiff's public records indicate that Plaintiff stopped residing there in or about November 2010, and moved to 625 Maple Street, Bethlehem, Pennsylvania 18018.  See <<https://w3.lexis.com/research2/pubrec/searchpr.do?_m=816fd23bd1496e5a37836d2ab437f10d&_src=314664.3004974&csi=314664&wchp=dGLbVzB-zSkAz&_md5=b046e61d5216dbebc622c0d034ae1470>>.  In light of the foregoing, the Court notes its concern with this discrepancy in Plaintiff's information and reminds him that, pursuant to Local Rule 11.1, each pleading must be executed under the litigant's *official* name and with designation of the litigant's *actual and current* address.

   [2]  In all substantive respects, Plaintiff's IFP affidavit is analogous to those commonly executed by prison inmates.  However, Plaintiff's submissions at bar indicate, without a doubt, that Plaintiff is *not* a confined individual.  Moreover, the address provided by Plaintiff (and Plaintiff's prior public-record addresses) does not suggest that Plaintiff is residing in a charitable facility that provides him shelter and subsistence without any cost.  Hence, Plaintiff's affidavit suggests information that cannot be squared with the realities of life.  Cf. Thornton v. Micrografx, 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("The court refuses to leave its common sense at the courthouse steps").  Plaintiff, therefore, will be directed to supplement his IFP application with detailed information verifying his pauper starus.

   2; (c) a copy of municipal order dated April 8, 2011, directing Plaintiff to pay $164 traffic violation penalty in monthly installments of $25, with a receipt attached suggesting that Plaintiff might have paid off $50 of that penalty, see id. at 3; (d) a copy of municipal court order suspending Plaintiff's driving license as of July 20, 2011, for non-payment of the remainder of that penalty (or for non-payment of that remainder and other penalties), see id. at 4; (e) a copy of a USPS tracking report indicating that Plaintiff send something to someone, and that something was delivered to the addressee on October 24, 2011. See id. at 5.

 c. Plaintiff's first "exhibit" is another document generated on the basis of an on-line template disseminated by one of "Moorish" websites, see id., Docket Entry No. 1-3. That document bears heading "Affidavit of Fact Writ of Præcipe."[3]  See id.

 d. Plaintiff's second "exhibit" presents a compilation of a few documents generated on the bases of on-line templates disseminated by one of "Moorish" websites, see id. Docket Entry No. 1-4; that compilation includes: (a) an eight-page document

---

 [3] The writ of præcipe was inherited by American jurisprudence from English common law (which, in turn, inherited it from ancient Roman law), where the writ of præcipe was a royal command to the king's sheriff ordering him to restore a plaintiff to his disputed land.  See Goldwin Smith, A Constitutional and Legal History of England 108 (1990).  From a purely executive order, the writ developed into a form which initiated judicial process in the King's court.  See R.C. Van Caenegem, Royal Writs in England from the Conquest to Glanvill 234-35 (1959).  Eventually, the term began to mean an order to the clerk of the court to issue an execution on a judgment of debt already rendered, see Yazoo & M. V. R. Co. v. Clarksdale, 257 U.S. 10, 19 (1921), and even the very piece of paper upon which the particularities of the writ are written.  See Black's Distionary 1173 (6th ed.).  The rationale of Plaintiff's resort to this legal term escapes this Court.  "[M]isused legalese, misplaced Latin terms, unwarranted excerpts from secondary sources and a mishmash of signs and symbols greatly detract from —rather than add to — the value of any legal document." Telfair v. Tandy, 2011 U.S. Dist. LEXIS 84737, at *23 (D.N.J. July 28, 2011)

   purporting to operate as Plaintiff's civil complaint (that was generated on the basis of an on-line template disseminated by one of "Moorish" websites), which first page is replicated as the first page of the docket entry No. 1, see id. at 1-8; (b) a copy of a five-page document (generated on the basis of another on-line template disseminated by one of "Moorish" websites) which Plaintiff, seemingly, sent to the State's Department of Motor Vehicles in November 2011, see id. at 9-13; (c) a letter from the State's Department of Motor Vehicles to Plaintiff informing him that, in October 2011, the State referred the unpaid remainder of Plaintiff's penalties for collection to a collection agency (which were, at that point, directed to collect a total of $1,100.83), see id. at 14; and (d) a copy of a USPS tracking report indicating that Plaintiff send something to someone, and that something was delivered to the addressee on November 7, 2011. See id. at 15. This package includes a civil cover sheet naming the State's Department of Motor Vehicle and municipal court officers (who signed and mailed that court's notices to Plaintiff) as Defendants. See id., Docket Entry No. 1-2.

2. In Bey v. NJ State Police ("Burton-II"), Civil Action No. 11-7351 (RBK) (N.J.D.), Plaintiff did not submit any IFP application, cover sheet or exhibits. See, generally, id. Rather, he submitted a civil complaint which, in itself, is a compilation of the following: (a) a seven-page document purporting to operate as Plaintiff's civil complaint that was generated on the basis of the same on-line template (disseminated by one of "Moorish" websites) that was used in Burton-I, differing from the pleading in Burton-I solely by the two paragraphs composing Plaintiff's factual assertions, see id. at 1-7; (b) a copy of

       another municipal court order, this time dated February 2, 2011, directing Plaintiff to pay $778 penalty on the basis of another traffic violation,[4] see id. at 8; (c) a copy of a letter informing Plaintiff that a municipal court order suspended Plaintiff's driving license as of November 23, 2011, for non-payment of the penalties imposed by the state courts, see id. at 9; and (d) a copy of a USPS tracking report indicating that Plaintiff send something to someone, and that something was delivered to the addressee on October 26, 2011. See id. at 10-11.

3.   Since all Plaintiff's submissions are either facially generated on the basis of templates disseminated by one of "Moorish" websites or, in alternative, heavily peppered with statements indicative of "Moorish" claims and resort to "Marrakush" lingo, it appears warranted to begin the Court's discussion of the two actions at bar with a brief summary of the built-in deficiencies, which necessarily plague each submission of this type.

> Two concepts, which may or may not operate as interrelated, color the issues at hand. One of these concepts underlies ethnic/religious identification movement of certain groups of individuals who refer to themselves as "Moors," while the other concept provides the basis for another movement of certain groups of individuals, which frequently produces these individuals' denouncement of United States citizenship, self-declaration of other, imaginary "citizenship" and accompanying self-declaration of equally imaginary "diplomatic immunity."
>
> [a].    Moorish Movement
>
> In 1998, the United States Court of Appeals for the Seventh Circuit – being one of the first courts to detail the concept of Moorish movement, observed as follows:
>
>> [The Moorish Science Temple of America is a] black Islamic sect . . . . [T]hree-fourths of its temples (congregations) are inside

---

[4] This penalty seemingly ensued from Plaintiff's other traffic violation.

> prisons. The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . . Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)

Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[5]

[b].   "Redemptionism," "Paper Terrorism" and Related Concepts

Shortly after the concept of Moorish movement was outlined by the Seventh Circuit, discussions of another movement appeared on the pages of legal opinions issued by the federal judiciary; that other movement was dubbed as "sovereign citizenship" movement. This movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a right-wing anarchist ideology originating in the theories of a group called the Posse Comitatus in the 1970s. Its adherents believe that virtually all existing government in the United States is illegitimate . . . . [Therefore, such] "sovereign citizens" wage war against the government and other forms of authority using "paper terrorism" harassment and intimidation tactics, and occasionally resorting to [physical] violence.

Sovereign Citizen Movement, Anti-Defamation League, at <<http://www.adl.org/Learn/ext_us/SCM.asp?LEARN_Cat=Extremism&LEARN_SubCat=Extremism_in_America&xpicked=4&item=sov>> (visited on Mar. 31, 2011).[6]

---

[5]  The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent." Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

[6]  The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of "world passports." "World passports," issued by the so-called World Service Authority

>Consequently, a decade after the Seventh Circuit's issuance of Bey v. Lane, the United States Court of Appeals for the Third Circuit noted a stream of government actions aimed at controlling the "paper terrorism" activities of sovereign citizens, which – by then – matured into a wide-spread criminal scheme, where the scheme participants' "self-legitimized" their names for the purposes of initiating fraudulent legal transactions. The Court of Appeals explained:
>
>>Evidently, [adherents of this scheme have been filing UCC claims "securing" their "property rights" in their own names in order to build on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." . . . Redemptionists claim that government has power only over the strawman and not over the live person, who remains

---

("WSA"), are not recognized, in the United States and in the majority of world nations, as substitutes to official documents, such as national passports or drivers' licenses. See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/07m1310.pdf>>. A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states. See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006). The WSA has been promoting "world citizenship" by issuing documents largely similar in their appearance to regular national passports, which the WSA called "world passports," to any person who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain such "passport" by filling out an application form at the WSA website. See <<http://www.worldgovernment.org/>>. Therefore, while some persons just denounce their United States citizenship under the claim of sovereign citizenship, see, e.g., Roche v. Attorney General, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. Mar. 21, 2011), others accompany their denouncements of United States citizenship by applications for "world passports" and attempts to use these passports as legally cognizable documents, sometimes for the purposes of perpetrating criminal schemes in the United States. See, e.g., Asghar v. State, 698 N.E.2d 879 (Ind. Ct. App. 1998). Moreover, a person's denouncement of his/her United States citizenship (being occasionally accompanied by the person's obtaining of a "world passport") frequently produces a peculiar "side effect" in the form of that person's self-grant of alternative, imaginary citizenship which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid the reach of law. See, e.g., U.S. Dist. Court v. Ephriam, 2009 U.S. Dist. LEXIS 103284 (D. Kan. Nov. 4, 2009).

> free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody.  If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

> Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008); accord Roche, 2011 U.S. App. LEXIS 5773, at 2 . . . .The "strawman" concept is, occasionally, presented/exploited somewhat differently by those redemptionists who claim that – at the moment of their denouncement of United States citizenship and/or their accompanying self-grant of imaginary alternative citizenship – their "strawman" incarnation became "deceased," and their live persons quasi-expatriated from the U.S. (while continuing their actual physical residence in the United States).  In connection with this odd quasi-expatriation scheme, such redemptionists often claim that their live persons: (a) hold "estates" in the form of actual physical bodies of their respective "quasi-deceased" strawmen;[7] and (b) reside in geographic locales "self-claimed away" from the United States.

---

[7]  This "estate" concept is legally deficient on its face.  As one court explained,

[such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate.  See Greneker v. Sprouse, 263 S.C. 571, 574 (1975) (clarifying that the estate is limited to the real and personal of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855 (Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same); Snyder v. Holy Cross Hospital, 30 Md. App. 317 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

>    [c].   Interplay Between Moorish and Sovereign Citizenship Movements
>
>    It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship movement (or with one's professing the theory of redemptionism, or with one's practice of "paper terrorism," claims of self- granted "diplomatic immunity," etc.).  However, and unfortunately enough, certain groups of individuals began merging these concepts by building on their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals deduce either from their self-granted "Moorish citizenship" and from their correspondingly-produced homemade "Moorish" documents (or from correspondingly-obtained "world passports") or from a multitude of other, equally non-cognizable under the law, bases, which these individuals keep creating in order to support their allegations of "diplomatic immunity."[8]

Murakush-Amexem, _ F. Supp. 2d _, 2011 U.S. Dist. LEXIS 51887 at *2-12 (footnotes in original).

---

[8]  Such claims of "diplomatic immunity" are without merit.  As it was already observed,

[Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments, since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone may renounce his/her United States citizenship, but this fact in no way establishes that Plaintiffs actually expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings.  See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

4. The above-quoted <u>Murakush-Amexem</u> decision built on a prior determination reached in this District with regard to a group of nineteen actions of this type (hereinafter, collectively, "<u>Marrakush Cases</u>"). <u>See</u> <u>Marrakush Soc'y v. N.J. State Police</u>, 2009 U.S. Dist. LEXIS 68057 (D.N.J. July 30, 2009). Addressing the submissions made in these nineteen actions, the <u>Marrakush Cases</u> court noted that the filings "were heavily peppered by references to the Barbary Treaties, United Nations documents, United States Constitution, . . . United States President, etc., [incuded] copies of . . . the Barbary Treaties, the United Nations Declaration on the Rights of Indigenous Peoples, etc., . . . pages of homemade quasi-documents, . . . flocks of apostles certifying unspecified documents . . . and analogous incomprehensible paperwork. All these submissions were heavily laden with Arabic and quasi-Arabic terminology, designations of geographic locales composed . . . of Earth coordinates combined with references to imaginary 'principalities' and 'territories,' . . . and riddle-like, self-created 'Marrakush' argot." <u>Murakush-Amexem</u>, _ F. Supp. 2d _, 2011 U.S. Dist. LEXIS 51887 at *20-22 (footnotes and citations to <u>Marrakush Cases</u> omitted).

5. The legal position taken in such submissions is necessarily deficient.

> [The key] feature present virtually in every submission made [in this type of cases] is these litigants' nearly invariable invocation of the Barbary Treaties (and, specifically, the Treaty of Morocco) in the context of challenging their searches, arrests, confinements, criminal proceedings, bails, fees, convictions, etc. that took place entirely within the United States territory and were effectuated by the law enforcement and judicial officers of the States of New Jersey, Delaware, Virginia, Florida, etc.
>
> All provisions of the Treaty with Morocco are, however, wholly inapposite to the type of challenges . . . . As noted <u>supra</u>, the Treaty with Morocco was executed, as all Barbary Treaties, with the aim to: (a) eliminate, or at

least curtail, the ill of piracy plaguing the coastal waters and ports of the post-medieval North African geopolitical bodies; and (b) eliminate, or at least halt the rise of, the fees charged by the rules of these geo-political bodies to the then-developing American merchantry for keeping "peace" in the ports and coastal waters subject to their dominion.  See Frank Lambert, The Barbary Wars: American Independence in the Atlantic World (2007).  It is, therefore, hardly surprising that the bulk of the provisions of the Barbary Treaties: (a) focused on issues of maritime/admiralty, war, merchant purchases/sales and akin matters; and (b) were set forth in terms of protections of "vessels."

This is particularly obvious in the Treaty with Morocco, which was a short accord consisting of mere twenty-five Articles, with only three Articles focusing not on acts of war, vessels, merchant activities, etc. but on the acts against generic civilian human beings.  See 1836 U.S.T. LEXIS 10, arts. 6, 20 and 21.  . . .  None of these three Articles could be read as applying to habeas or civil rights claims raised by [the "Murakush" litigants] against state police or prosecutorial officers, or judges, as to the claims based on the events of [their] arrests, incarceration, bailing, prosecution, convictions, etc.  See, e.g., Seals-Bey v. Cross, 2010 U.S. Dist. LEXIS 87794 (N.D. W. Va. July 23, 2010) . . . .  Indeed, Article Six of the Treaty, was fashioned to prevent undue enslaving of American citizens (and also to prevent theft of American citizens' goods) in the Mediterraneans by pirating Moors who were either of Morrocan or of non-Morrocan domicile and who were taking undue advantage of the passage ways, trade, accommodations, etc. in Moroccan coastal waters and ports.  This Article is facially inapplicable to the [events which did] not occur anywhere near the coastal waters and ports of the Kingdom of Morocco and, to top it all off, were not conducted by Moors.  See Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L. Rev. 830, 876 (2006) (under the "Treaty with Morocco, . . . the locus of the [T]reaty partners' interaction [was] confined to the Mediterranean and therefore not within the [geographical] jurisdiction of the United States"); accord Pitt-Bey v. District of Columbia, 942 A.2d 1132 (D.C. 2008) (a self-proclaimed "Moorish" minister has no diplomatic immunity protection from criminal proceedings conducted within the United States territory).  Analogously, Articles Twenty and Twenty-One of the Treaty are facially inapplicable to [the "Murakush' litigants], since they had no right to consular assistance, and no United States citizen killed or wounded them in the Mediterranean: all the events they complain about occurred] well within the borders of the United States . . . .  See United States v. Casey, 2005 U.S. Dist. LEXIS 39785 (E.D. Mo. July 21, 2005) (the decision to criminally prosecute a self-declared "Moor" is

constitutionally independent of any consular interest in assistance) (citing United States v. Ortiz, 315 F.3d 873, 886 (8th Cir. 2002); United States v. De La Pava, 268 F.3d 157, 165-66 (2nd Cir. 2001); United States v. Emuegbunam, 268 F.3d 377, 391-94 (6th Cir. 2001); United States v. Lombera-Camorlinga, 206 F.3d 882, 885-86 (9th Cir. 2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1195-96 (11th Cir. 2000)). Two conclusions ensue from the aforesaid analysis. The first one is that all . . . claims challenging any events . . . that occur within what is the United States' actual geographical territory (and, especially, if these events involve those individuals who reside within that territory) cannot implicate *any* provision of the Treaty with Morocco. The second conclusion, building on the prior one, is that all such . . . claims . . . are necessarily frivolous which, in turn, means that any pleading asserting such claims is not bona fide and warrants no examination on merits.

> [I]t is well-recognized . . . that such organizations as the Moorish American Nation and [similar imaginary creations, like] the Nation of Washitaw, are:
>
>> notorious organization[s] of scofflaws and ne'er-do-wells who attempt to benefit from the protections of federal and state law while simultaneously proclaiming their independence from and total lack of responsibility under those same laws. Sanders-Bey v. United States, 267 F. App'x 464, 466 (7th Cir.2008) (finding that "the Washitaw Nation . . . is not recognized by the United States government"); Bybee v. City of Paducah, 46 F. App'x 735, 736-37 (6th Cir.2002) (finding that the "Nation of Washitaw" is "fictional"); United States v. Gunwall, 1998 U.S.App. LEXIS 18596, at *11 (10th Cir. Aug. 12, 1998) (rejecting claim that the court had no jurisdiction over a member of the Washitaw as "frivolous"); Bey v. Louisiana, 2008 U.S. Dist. LEXIS 91606 (W.D. La. July 11, 2008) (finding that plaintiff's claim to land as a member of the Washitaw was "patently frivolous" and rested on documents of "dubious legal significance"); Great Seal Nat'l Ass'n of Moorish Affairs v. 46th Dist. Ct. of Oakland County, 2007 U.S. Dist. LEXIS 3199, at *2 (E.D. Mich. Jan. 17, 2007) (dismissing claim that plaintiffs owned several parcels of property by virtue of their Moorish ancestry as "baseless, fantastic and delusional" and finding the complaint to be "indecipherable"); Khattab El v. U.S. Justice Dep't, 1988 U.S. Dist. LEXIS 544, at *5 (E.D. Pa.

>> Jan. 22, 1988) (holding that "the United States has not recognized the sovereignty of the Moorish Nation, thus precluding sovereign immunity claims").
>
> El-Bey v. United States, 2009 U.S. Dist. LEXIS 33838 (M.D.N.C. Jan. 26, 2009). Any claims or arguments raised by Plaintiff which are based on his membership in the Moorish American Nation are [by definition] frivolous.
>
> Hampton v. City of Durham, 2010 U.S. Dist. LEXIS 100255, at *6-8 (M.D.N.C. Sept. 22, 2010).

Murakush-Amexem, _ F. Supp. 2d _, 2011 U.S. Dist. LEXIS 51887 at *78-88 (footnotes omitted).

6. Since: (a) Plaintiff here elected to adopt alias utilizing the "Bey" suffix in lieu of his last name and appended a UCC "all-rights-reserved" lingo to that identification; (b) his submissions designate geographic locales by resorting to such terms as "Amexem," "Timbuktu Territory" and akin; (c) his civil complaint makes senseless references to the Treaty with Morocco (which cannot have any relation to Plaintiff's claims) and the proclamations issued by the United Nations Organization (which have no binding effect on the United States courts); and (d) other typical paraphernalia characteristic of "Mooring/Marrakush" submissions, Plaintiff's pleadings, if read literally, present nothing but mockery of this Court and warrant outright dismissal with prejudice.

7. However, this Court recognizes that a number of unscrupulous persons and/or entities (unduly capitalizing on the confusion and hype created by the above-detailed "Moorish/Marrakush" and redemptionist movements) have introduced into public domain a number of websites inviting unsuspecting pro se litigants to downloading and use these website's hoax legal forms heavily laden with misused Latin terms, senseless legal

statements, "Moorish/Marrakush" argot and akin.  See Bey v. Stumpf, 2011 U.S. Dist. LEXIS 120076, at *28-36 (detailing the nature of this ill and providing examples of such hoax forms).  Therefore, being mindful of Plaintiff's pro se litigant status and, hence, Plaintiff's potential susceptibility to confusion by these unscrupulous sources (which strive to appear legitimate regardless of the hoax products they disseminate), this Court finds it warranted to allow Plaintiff an opportunity to litigate his legal claims, if any, in good faith, by submitting: (a) a supplement to his IFP application (duly detailing Plaintiff's income, possessions and expenses); and (b) Plaintiff's amended complaints stating his challenges in each of the above-captioned matters.  The Court stresses that Plaintiff's IFP application and his amended complaints, if submitted, should be void of any "Moorish/Marrakush" argot or of any "Moorish/Marrakush" legal claims.  In other words, Plaintiff shall utilize the forms provided by the Clerk and complete these forms in *plain English*, with references to – and only to – *current and relevant United States law* (and, if applicable, current and relevant New Jersey state law).  The Court also takes this opportunity to warn Plaintiff that his persistence at submitting documents executed in "Moorish" or "Marrakush" style and/or argot could result in conclusive closure of these two matters and, moreover, might cause imposition of sanctions, if warranted.

8. Finally, taking notice of those few sentences in Plaintiff's submission that appear to assert factual claims and are not tainted by "Moorish" or "Marrakush" references, the Court finds it warranted to provide Plaintiff with some legal guidance as to the claims Plaintiff,

seemingly, was attempting to assert.[9]  Federal courts are courts of limited jurisdiction and can only entertain a case if Congress has granted the federal courts jurisdiction to hear it. See Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 103-04 (3d Cir. 2011). Thus, Plaintiff must assert either a valid federal cause of action, see 28 U.S.C. § 1331 ("district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"), or complete diversity between parties and legitimate amount is dispute.  See 28 U.S.C. § 1332(a)(1) (providing that district courts have original jurisdiction of civil actions between citizens of different states where the amount in controversy exceeds $75,000).  Therefore, Plaintiff's references to "divine constitution" or "zodiac constitution," or his senseless shuffling of legal terms, such as "abuse of process, abuse of power, collusion, conspiracy, racketeering, denial of due process, extortion, fraud and theft," or his resort to such legally-senseless colloquial layperson's expressions as "dishonor in commerce" would not provide this Court with proper jurisdiction; rather, the facts and the claims asserted in

---

[9]  In his Burton-I action, Plaintiff notes that his driver's license was suspended for non-payment of the ordered penalties and that a collection agency was hired to obtain these payments. See Burton-I, Docket Entry No. 1-4, at 4-5.  In connection with that mentioning, Plaintiff seeks $75,000 in compensatory and $75,000 in punitive damages from the State's Department of Motor Vehicles, and the same amounts from: (a) an employee of the Department of Motor Vehicles; and (b) the collection agency hired to collect the payments due from Plaintiff.  See id. at 7.  In his Burton-II action, Plaintiff asserts that he was ordered to pay a traffic violation penalty and a restitution, totaling $778; that order was issued by a municipal judge and corresponded, in time, with the period of Plaintiff's seemingly second incarceration.  See Burton-II, Docket Entry No. 1, at 3-4.  Qualifying the municipal judge's order as "abuse of process, abuse of power, collusion, conspiracy, racketeering, denial of due process, extortion, fraud, theft and dishonor in commerce," id. at 3, Plaintiff "demand[s that] this . . . Court [would] stop these abuses" and seeks $75,000 in compensatory and $75,000 in punitive damages from the State police and the same amounts from the State's municipal court (or the municipal judge who ordered the fines) and the municipal court staff who processed and sent that judicial orders.  See id. at 5-6.

such fashion would fall outside the Court's mandate and would warrant dismissal with prejudice.[10] Therefore, Plaintiff's amended pleading must state facts asserting a *cognizable wrong*, accompany these factual pleadings with assertions of *cognizable legal claims* and sufficiently indicate that each entity or person named as defendant was personally involved in the wrongs asserted. The Court urges Plaintiff to execute his amended pleadings, if any, thoughtfully and carefully, keeping in mind that this Court's Article III mandate is limited to resolution of legal cases and controversies. See Doe v. Lower Merion Sch. Dist., 2011 U.S. App. LEXIS 24747, at *39-40 (3d Cir. Pa. Dec. 14, 2011) (citing and Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), and Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 471 (1982)). Therefore, Plaintiff shall *not* construe this Court's decision to grant Plaintiff leave to amend as the Court's invitation to "vent out" Plaintiff's emotion or as a suggestion to utilize this Court's powers in order to senselessly harass defendants for their legitimate actions (e.g., duly entering state court orders or making judicial

---

[10] Taking notice of Plaintiff's apparent disappointment with the determinations reached by his municipal judge, with suspension of his driver's license and with the State's reference of Plaintiff's debt to a collection agency, the Court takes this opportunity to point out that: (a) federal courts do *not* sit in appellate review of the decisions rendered by state judiciary, see In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005) (elaborating on the workings of the Rooker-Feldman doctrine), and if Plaintiff is unhappy with a lower state court's determination, his remedy is a state court appeal rather than a federal action; (b) state court judges are immune from suits for damages based on the determinations reached in their judicial capacity, see Figueroa v. Blackburn, 208 F.3d 435, 440 (3d Cir. 2000); (c) neither the acts of mailing judicial orders nor collection of judicially ordered debts is a wrongful activity; and (d) there is no constitutional right to have one's driver's license remain unsuspended if the driver failed to satisfy the penalty imposed. See Mackey v. Montrym, 443 U.S. 1 (1979); Dixon v. Love, 431 U.S. 105 (1977); Bell v. Burson, 402 U.S. 535 (1971), Tomai-Minogue v. State Farm Mut. Auto. Ins. Co., 770 F.2d 1228, 1230 (4th Cir. 1985); Ross v. Gunaris, 395 F. Supp. 623, 627-28 (D. Mass. 1975).

determinations). See Ashcroft v. Iqbal, 556 U.S. 662 (2009). "The courts in this nation stand ready to address challenges brought by litigants in good faith. Which, in turn, means that the judiciary — including the Judges in this District — expect litigants to treat their litigation with utmost seriousness, without abusing legal process and without unduly testing of the resolve or common sense of the judiciary." In re Telfair, 745 F. Supp. 2d 536, 580 (D.N.J. 2010).

> Th[is] Court does not know why . . . Bey, El, etc. have chosen to file their labyrinthine, multi-defendant. . . actions in federal courts over the years, or why they have elected to file the Instant Matter, ... in the last few weeks. What the Court does know is that many of these actions appear frivolous on their face, and all have been filed at no cost to these litigants (given that they have not retained counsel, have not paid filing fees, and in most cases have filed facially insufficient, mockery-of-the-court-like IFP petitions). In stark contrast to the numerous free rides through the federal judicial system that these litigants have been enjoying, their litigiousness has exacted and will continue to exact a heavy price on the finite resources of this District Court and other federal courts at district level and, hence, on litigants in other matters as to whom justice will be delayed while those scarce [judicial] resources are expended to process . . . Bey and El's bounty. See Miller v. Donald, 541 F.3d 1091, 1096 (11th Cir. 2008) ("Frivolous and vexatious law suits threaten the availability of a well-functioning judiciary to all litigants"); Procup v. Strickland, 792 F.2d 1069, 1072 (11th Cir. 1986) (en banc) ("Every lawsuit filed, no matter how frivolous or repetitious, requires the investment of court time, whether the complaint is reviewed initially by a law clerk, a staff attorney, a magistrate, or the judge"). The undersigned will not sit idly by as this District Court is inundated with harassing and vexatious litigation arising from whatever . . . Bey and El's perceived multimillion-dollar constitutional affront du jour might be.

Bethel v. Bosch, 2010 U.S. Dist. LEXIS 128065, at *13 (S.D. Ala. Dec. 2, 2010).

IT IS, therefore, on this _____29th_____ day of _____February_____, 2012,

ORDERED that Plaintiff's applications to proceed in forma pauperis in the above-captioned matters is *conditionally* granted, subject to Plaintiff's submission, within thirty days

from the date of entry of this Memorandum Opinion and Order, of Plaintiff's supplement to his in forma pauperis application. Such supplement shall state, under penalty of perjury, all forms of income Plaintiff receives, if any, the expenses Plaintiff incurs on monthly basis, if any, the value of possession Plaintiff has, if any, and – if no income and no expenses are reported – Plaintiff shall clarify the means supporting his existence, including his shelter, food and other needs; and it is further

ORDERED that, in the event Plaintiff concludes, in light of the guidance provided to him herein, that Plaintiff has legitimate challenges to litigate, Plaintiff shall submit, within thirty days from the date of entry of this Memorandum Opinion and Order, Plaintiff's amended complaint(s) stating the factual predicate(s) underlying his challenges, asserting cognizable claims, and clarifying each named defendant's personal involvement in the alleged wrongs. Such amended pleadings shall be executed in plain English, void of facially frivolous challenges and of any "Moorish/Marrakush" argot/legal positions. Each such pleading shall be executed under penalty of perjury, and each must bear Plaintiff's *official* name and include his *actual and current* address; and it is further

ORDERED that the Clerk shall administratively terminate both above-captioned actions by making, in each of these matters, a new and separate docket entry reading, "CIVIL CASE ADMINISTRATIVELY TERMINATED SUBJECT TO REOPENING UPON TIMELY RECEIPT OF PLAINTIFF'S SUBMISSIONS ORDERED BY THE COURT"; and it is finally

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon Plaintiff by regular United States mail, and shall include in the said mailing: (a) one blank in

<u>forma</u> <u>pauperis</u> form for individuals seeking to commence a civil proceeding; and (b) two blank civil complaint forms.

                                                                                   <u>s/Robert B. Kugler</u>
                                                                                  **ROBERT B. KUGLER**
                                                                                  **United States District Judge**